**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| **CDK GLOBAL, LLC** | : | |
| 1950 Hassell Road | : | |
| Hoffman Estates, IL 60169, | : | CASE NO.:  1:23-cv-00357 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE: |
| -v- | : | |
| | : | |
| **TEKION CORP** | : | |
| 5934 Gibraltar Drive | : | |
| Pleasanton, CA 94588, | : | **COMPLAINT FOR DAMAGES** |
| | : | |
| **ANDREW BACKS** | : | |
| 2328 Hill Avenue | : | **JURY DEMAND ENCLOSED** |
| Middletown, OH 45044, | : | **HEREIN** |
| | : | |
| **DEMI AUEL** | : | |
| 2829 Jessup Road #1 | : | |
| Cincinnati, OH 45205, | : | |
| | : | |
| **TYLER SPARKS** | : | |
| 5654 Venus Lane | : | |
| Fairfield, OH 45014, | : | |
| | : | |
| **RICHARD DANSBY** | : | |
| 2527 Satinwood Court | : | |
| Arlington, TX 76001, | : | |
| | : | |
| **CHRISTOPHER ABBOTT** | : | |
| 409 Laurel Avenue | : | |
| Hamilton, OH 45015, | : | |
| | : | |
| Defendants. | : | |

For its Complaint against Defendants Tekion Corp ("Tekion"), Andrew Backs ("Backs"), Demi Auel ("Auel"), Tyler Sparks ("Sparks"), Richard Dansby ("Dansby"), and Christopher Abbott ("Abbott") (collectively, "Defendants"), Plaintiff CDK Global, LLC ("CDK" or "Plaintiff") states as follows:

## PARTIES

1.      CDK is a Delaware limited liability company, doing business in Ohio, with its principal place of business in Hoffman Estates, Illinois.  CDK operates an Ohio office located at 4600 Montgomery Road, Cincinnati, OH 45212.

2.      Tekion is a Delaware limited liability company, doing business in Ohio, with its principal place of business in Pleasanton, California.  Tekion operates an Ohio office located at 9100 Centre Pointe Drive, West Chester Township, OH 45069.

3.      Backs is an individual who resides in Middletown, Ohio and is a citizen of the State of Ohio.  Backs was formerly employed by CDK as a Senior Technical Support Analyst.

4.      Auel (formerly known as Demi Helterbridle) is an individual who resides in Cincinnati, Ohio and is a citizen of the State of Ohio.  Auel was formerly employed by CDK as an Information Technology Analyst.

5.      Sparks is an individual who resides in Fairfield, Ohio and is a citizen of the state of Ohio.  Sparks was formerly employed by CDK as a Customer Care Supervisor.

6.      Dansby is an individual who resides in Arlington, Texas and is a citizen of the State of Texas.  Dansby was formerly employed by CDK as a Senior Technical Support Analyst.

7.      Abbott is an individual who resides in Hamilton, Ohio and is a citizen of the State of Ohio.  Abbott was formerly employed by CDK as a Manager, Fixed Ops.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims brought under The Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*  Further, this Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) for all

remaining claims because they arise out of the same common nucleus of operative facts as CDK's claims under 18 U.S.C. § 1831, *et seq.*

9.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between CDK and all Defendants and the amount in controversy is reasonably expected to exceed the sum of $75,000, excluding costs and interest.

10.     This Court has personal jurisdiction over Tekion pursuant to R.C. §§ 2307.382(A)(1) and (2) because it regularly transacts business within the State of Ohio and contracts to supply goods and services in Ohio.  Moreover, this Court has personal jurisdiction over Tekion pursuant to R.C. §§ 2307.382 because Tekion has caused tortious injury to CDK in Ohio and has done so with the knowledge that CDK would be injured by its actions, and Tekion regularly solicits, engages in, and derives substantial revenue from business conducted in Ohio.

11.     This Court has personal jurisdiction over Backs pursuant to R.C. §§ 2307.381-.385 and the Due Process Clauses of the federal and Ohio constitutions because he resides in and has continuous and systematic contacts with the State of Ohio.  Further, this Court has personal jurisdiction over Backs pursuant to R.C. § 2307.382 because he (a) transacts business in this state, (b) contracts to supply services or goods in this state, and (c) has caused tortious injury in this state.

12.     This Court has personal jurisdiction over Auel pursuant to R.C. §§ 2307.381-.385 and the Due Process Clauses of the federal and Ohio constitutions because she resides in and has continuous and systematic contacts with the State of Ohio.  Further, this Court has personal jurisdiction over Auel pursuant to R.C. § 2307.382 because she (a) transacts business in this state, (b) contracts to supply services or goods in this state, and (c) has caused tortious injury in this state.

13. This Court has personal jurisdiction over Sparks pursuant to R.C. §§ 2307.381-.385 and the Due Process Clauses of the federal and Ohio constitutions because he resides in and has continuous and systematic contacts with the State of Ohio. Further, this Court has personal jurisdiction over Sparks pursuant to R.C. § 2307.382 because he (a) transacts business in this state, (b) contracts to supply services or goods in this state, and (c) has caused tortious injury in this state.

14. This Court has personal jurisdiction over Dansby pursuant to R.C. §§ 2307.381-.385 and the Due Process Clauses of the federal and Ohio constitutions because he has continuous and systematic contacts with the State of Ohio. Further, this Court has personal jurisdiction over Dansby pursuant to R.C. § 2307.382 because he (a) transacts business in this state, (b) contracts to supply services or goods in this state, and (c) has caused tortious injury in this state.

15. This Court has personal jurisdiction over Abbott pursuant to R.C. §§ 2307.381-.385 and the Due Process Clauses of the federal and Ohio constitutions because he resides in and has continuous and systematic contacts with the State of Ohio. Further, this Court has personal jurisdiction over Abbott pursuant to R.C. § 2307.382 because he (a) transacts business in this state, (b) contracts to supply services or goods in this state, and (c) has caused tortious injury in this state.

16. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to CDK's claims occurred in this District.

## **FACTUAL BACKGROUND**

17. CDK provides integrated information technology and digital marketing to the automotive, heavy truck, recreation, and heavy equipment industries. Plaintiff's products help to integrate clients' buying processes and include targeted advertising and marketing, as well as

products for the sale, financing, insuring, parts supply, repair, and maintenance of vehicles. CDK serves nearly 15,000 retail locations in North America, with 16 locations in the US, Canada and India. CDK is headquartered in Hoffman Estates, Illinois, with a key facility in Norwood, Ohio.

18.     The automotive software business is highly competitive. Accordingly, CDK considers its pricing, costs, designs, services, sales plans, business model, strategic growth plans, training methods, employee ratings, individual market data, and vendor and customer information to be confidential, proprietary, and trade secret information. Such information is not shared with the public because it could be used to CDK's detriment should such information fall into the hands of a competitor.

19.     CDK has taken reasonable steps to protect against the public disclosure of its confidential, proprietary, and trade secret information, in part, by having certain employees with access to CDK's confidential, proprietary, and trade secret information execute non-competition, non-disclosure, and non-solicitation agreements, as described in more detail below.

20.     Additionally, CDK restricts access to and password protects its confidential, proprietary, and trade secret information such as pricing, costs, designs, services, sales plans, business model, strategic growth plans, training methods, employee ratings, individual market data, vendor and customer information, and only certain CDK employees have access to this information.

21.     Tekion is a cloud technology company focused on business applications aimed at the automotive retail industry operating across the country.

22.     Tekion is seeking to further develop and expand its automotive software business, and to compete directly with CDK nationwide.

*Backs' Career with CDK and the Backs Agreement*

23.     Backs began his employment with CDK in September 2019 in Cincinnati, Ohio, and was employed by CDK until January 2023.

24.     During his employment with CDK, Backs held the position of Senior Technical Support Analyst.

25.     During his employment with CDK, Backs had access to confidential, proprietary, and trade secret information by virtue of his position with CDK.

26.     Given Backs' intimate knowledge of CDK's business, and as part of an in consideration of his employment with CDK, Backs agreed to a variety of obligations contained in a Confidentiality and Restrictive Covenants Agreement (the "Backs Agreement").  A true and accurate copy of the Backs Agreement is attached as Exhibit A.

27.     The Backs Agreement was executed on or about August 27, 2019.

28.     The purpose of the Backs Agreement was, among other things, to protect against unfair competition and the public disclosure of CDK's trade secret and confidential and proprietary information.

29.     The Backs Agreement defines "Confidential Information" to include information about CDK's operations, products, and services; research and development of CDK products and services; contact and pricing information related to CDK's clients, business partners, and vendors; CDK's financial, marketing, and sales information; and technical expertise and know-how developed by CDK.

30.     The Backs Agreement defines "Competing Business" to mean any entity, regardless of form, "that is engaged in any business or enterprise that is the same as, or

substantially the same as, the Business of CDK for that part of the business in which I have worked or to which I have been exposed during my employment with CDK."

31. Pursuant to Paragraph 6 of the Backs Agreement, Backs agreed to a non-disclosure provision that barred him from disclosing any Confidential Information.

32. Pursuant to Paragraph 3 of the Backs Agreement, Backs agreed to a non-competition provision barring him from working for a Competing Business following the termination of his employment.

33. Paragraph 14 of the Backs Agreement specifically contemplates the issuance of an injunction as a remedy for any breach of its terms by Backs.

34. Pursuant to Paragraph 14 of the Backs Agreement, Backs agreed to pay CDK's attorneys' fees and costs incurred in an action relating to his breach of the Backs Agreement.

35. Backs' last day of employment with CDK was on or about January 3, 2023. Following his resignation from CDK, Backs continued to be bound by the foregoing non-competition and non-disclosure provisions in the Backs Agreement.

36. Backs began employment with Tekion in 2023 shortly after his resignation from CDK.

### *Auel's Career with CDK and the Auel Agreement*

37. Auel began her employment with CDK in March 2020 in Cincinnati, Ohio, and was employed by CDK until April 2023.

38. During her employment with CDK, Auel held the position of Technical Support Analyst.

39. During her employment with CDK, Auel had access to confidential, proprietary, and trade secret information by virtue of her position with CDK.

40. Given Auel's intimate knowledge of CDK's business, and as part of an in consideration of her employment with CDK, Auel agreed to a variety of obligations contained in a Confidentiality and Restrictive Covenants Agreement (the "Auel Agreement"). A true and accurate copy of the Auel Agreement is attached as Exhibit B.

41. The Auel Agreement was executed on or about February 3, 2020.

42. The purpose of the Auel Agreement was, among other things, to protect against unfair competition and the public disclosure of CDK's trade secret and confidential and proprietary information.

43. The Auel Agreement defines "Confidential Information" to include information about CDK's operations, products, and services; research and development of CDK products and services; contact and pricing information related to CDK's clients, business partners, and vendors; CDK's financial, marketing, and sales information; and technical expertise and know-how developed by CDK.

44. The Auel Agreement defines "Competing Business" to mean any entity, regardless of form, "that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of CDK for that part of the business in which I have worked or to which I have been exposed during my employment with CDK."

45. Pursuant to Paragraph 6 of the Auel Agreement, Auel agreed to a non-disclosure provision that barred her from disclosing any Confidential Information.

46. Pursuant to Paragraph 3 of the Auel Agreement, Auel agreed to a non-competition provision barring her from working for a Competing Business following the termination of her employment.

47.     Paragraph 14 of the Auel Agreement specifically contemplates the issuance of an injunction as a remedy for any breach of its terms by Auel.

48.     Pursuant to Paragraph 14 of the Auel Agreement, Auel agreed to pay CDK's attorneys' fees and costs incurred in an action relating to her breach of the Auel Agreement.

49.     Auel's last day of employment with CDK was on or about April 12, 2023. Following her resignation from CDK, Auel continued to be bound by the foregoing non-competition and non-disclosure provisions in the Auel Agreement.

50.     Auel began employment with Tekion in 2023 shortly after her resignation from CDK.

*Sparks' Career with CDK and the Sparks Agreement*

51.     Sparks began his employment with CDK in July 2016 in Cincinnati, Ohio, and was employed by CDK until December 2022.

52.     During his employment with CDK, Sparks held the position of Application Support Engineer.

53.     During his employment with CDK, Sparks had access to confidential, proprietary, and trade secret information by virtue of his position with CDK.

54.     Given Sparks' intimate knowledge of CDK's business, and as part of an in consideration of his employment with CDK, Sparks agreed to a variety of obligations contained in a Restrictive Covenants Agreement (the "Sparks Agreement").  A true and accurate copy of the Agreement is attached as Exhibit C.

55.     The Sparks Agreement was executed on or about May 19, 2016.

56. The purpose of the Sparks Agreement was, among other things, to protect against unfair competition and the public disclosure of CDK's trade secret and confidential and proprietary information.

57. The Sparks Agreement defines "Confidential Information" to include information about CDK's operations, products, and services; research and development of CDK products and services; contact and pricing information related to CDK's clients, business partners, and vendors; CDK's financial, marketing, and sales information; and technical expertise and know-how developed by CDK.

58. The Sparks Agreement defines "Competing Business" to mean any entity, regardless of form, "that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of CDK for that part of the business in which I have worked or to which I have been exposed during my employment with CDK."

59. Pursuant to Paragraph 4 of the Sparks Agreement, Sparks agreed to a non-disclosure provision that barred him from disclosing any Confidential Information.

60. Pursuant to Paragraph 6 of the Sparks Agreement, Sparks agreed to a non-competition provision barring him from working for a Competing Business following the termination of his employment.

61. Paragraph 10 of the Sparks Agreement specifically contemplates the issuance of an injunction as a remedy for any breach of its terms by Sparks.

62. Sparks' last day of employment with CDK was on or about December 23, 2022. Following his resignation from CDK, Sparks continued to be bound by the foregoing non-competition and non-disclosure provisions in the Sparks Agreement.

63.     Sparks began employment with Tekion in 2023 shortly after his resignation from CDK.

### *Dansby's Career with CDK and the Dansby Agreement*

64.     Dansby began his employment with CDK in May 2011, working remotely for CDK's Cincinnati, Ohio office and was employed by CDK until May 2023.

65.     During his employment with CDK, Dansby held the position of Senior Technical Support Analyst.

66.     During his employment with CDK, Dansby had access to confidential, proprietary, and trade secret information by virtue of his position with CDK.

67.     Given Dansby's intimate knowledge of CDK's business, and as part of an in consideration of his employment with CDK, Dansby agreed to a variety of obligations contained in a Non-Disclosure Agreement (the "Dansby Agreement").  A true and accurate copy of Dansby's acknowledgement and agreement to be bound by the Dansby Agreement is attached as Exhibit D.[1]

68.     The Dansby Agreement was executed on or about May 5, 2011.

69.     The purpose of the Dansby Agreement was, among other things, to protect against unfair competition and the public disclosure of CDK's trade secret and confidential and proprietary information.

70.     The Dansby Agreement defines "Confidential Information" to include information about CDK's operations, products, and services; research and development of CDK products and services; contact and pricing information related to CDK's clients, business partners, and vendors; CDK's financial, marketing, and sales information; and technical expertise and know-how developed by CDK.

---

[1] Upon information and belief, the "Non-Disclosure" Agreement signed by Dansby contained substantially the same non-competition, non-solicitation, and non-disclosure provisions as the Backs, Auel, and Sparks Agreements.

71.     The Dansby Agreement defines "Competing Business" to mean any entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of CDK for that part of the business in which I have worked or to which I have been exposed during my employment with CDK.

72.     Pursuant to the Dansby Agreement, Dansby agreed to a non-disclosure provision that barred him from disclosing any Confidential Information.

73.     Pursuant to the Dansby Agreement, Dansby agreed to a non-competition provision barring him from working for a Competing Business following the termination of his employment.

74.     Pursuant to the Dansby Agreement, Dansby agreed to a non-solicitation provision barring him from soliciting CDK's customers and/or employees.

75.     The Dansby Agreement specifically contemplates the issuance of an injunction as a remedy for any breach of its terms by Dansby.

76.     Before leaving CDK, Dansby solicited other CDK employees, including but not limited to Jared Kretschmar, to apply for positions with Tekion.

77.     Dansby's last day of employment with CDK was on or about May 4, 2023. Following his resignation from CDK, Dansby continued to be bound by the foregoing non-competition and non-disclosure provisions in the Dansby Agreement.

78.     Dansby began employment with Tekion in 2023 shortly after his resignation from CDK.

### *Abbott's Employment with CDK and the Abbott Agreement*

79.     Abbott began his employment with CDK in January 2016 in Cincinnati, Ohio, and was employed by CDK until November 2022.

80.     During his employment with CDK, Abbott held the position of Manager, Fixed Ops.

81.     During his employment with CDK, Abbott had access to confidential, proprietary, and trade secret information by virtue of his position with CDK.

82.     Given Abbott's intimate knowledge of CDK's business, and as part of an in consideration of his employment with CDK, Abbott agreed to a variety of obligations contained in a Non-Disclosure Agreement (the "Abbott Agreement"). A true and accurate copy of Abbott's acknowledgement and agreement to be bound by the Abbott Agreement is attached as Exhibit E.[2]

83.     The Abbott Agreement was executed on or about November 12, 2015.

84.     The purpose of the Abbott Agreement was, among other things, to protect against unfair competition and the public disclosure of CDK's trade secret and confidential and proprietary information.

85.     The Abbott Agreement defines "Confidential Information" to include information about CDK's operations, products, and services; research and development of CDK products and services; contact and pricing information related to CDK's clients, business partners, and vendors; CDK's financial, marketing, and sales information; and technical expertise and know-how developed by CDK.

86.     The Abbott Agreement defines "Competing Business" to mean any entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of CDK for that part of the business in which I have worked or to which I have been exposed during my employment with CDK.

---

[2] Upon information and belief, the "Non-Disclosure" Agreement signed by Abbott contained substantially the same non-competition, non-solicitation, and non-disclosure provisions as the Backs, Auel, and Sparks Agreements.

87.     Pursuant to the Abbott Agreement, Abbott agreed to a non-disclosure provision that barred him from disclosing any Confidential Information.

88.     Pursuant to the Abbott Agreement, Abbott agreed to a non-competition provision barring him from working for a Competing Business following the termination of his employment.

89.     The Abbott Agreement specifically contemplates the issuance of an injunction as a remedy for any breach of its terms by Abbott.

90.     Abbott's last day of employment with CDK was on or about November 30, 2022. Following his resignation from CDK, Abbott continued to be bound by the foregoing non-competition and non-disclosure provisions in the Abbott Agreement.

91.     Abbott began employment with Tekion in 2022 shortly after his resignation from CDK.

## CAUSES OF ACTION

### COUNT ONE
### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT – 18 U.S.C. § 1831, *et seq.*
### (As to All Defendants)

92.     CDK incorporates the preceding paragraphs as if fully set forth herein.

93.     CDK possesses certain confidential, proprietary, and trade secret information, including CDK's pricing, costs, designs, services, sales plans, business model, strategic growth plans, training methods, employee ratings, individual market data, and vendor and customer information. Such information constitutes a "trade secret" under 18 U.S. C. § 1831, *et seq.*

94.     CDK's trade secret information is used in, or intended for use in, interstate or foreign commerce.

95.     CDK's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the information.

96.     CDK has taken reasonable steps to protect its trade secrets from disclosure, including the trade secrets information possessed and/or stolen by Backs, Auel, Sparks, Dansby, and Abbott (the "Individual Defendants") and used by Tekion to unfairly compete with CDK.

97.     CDK's reasonable steps to protect its trade secrets from disclosure include, among other things, requiring the Individual Defendants to sign their Agreements with CDK containing non-competition, non-solicitation, non-disclosure, and confidentiality provisions.  Moreover, CDK restricts access to and password protects its trade secret information, including but not limited to, training methods, designs, customer information, and market data.

98.     As employees of CDK, the Individual Defendants all had access to and knowledge of CDK's trade secrets.

99.     Both during and after their employment with CDK, the Individual Defendants all had a duty to maintain the secrecy of CDK's trade secrets and to not disclose them to third parties.

100.    Both during and after their employment with CDK, the Individual Defendants misappropriated CDK's trade secrets by (i) using improper means to acquire CDK's trade secrets by stealing the information without CDK's knowledge or consent in breach of their Agreements and duties owed to CDK, (ii) by disclosing the trade secrets to a third party – CDK's competitor, Tekion – without CDK's knowledge or consent, and (iii) using the trade secrets to assist Tekion build up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK.  The Individual Defendants did so with knowledge that they acquired the trade

secrets under circumstances giving rise to a duty to maintain their secrecy and used improper means to acquire the trade secrets.

101. Alternatively, by virtue of their new positions with Tekion it is inevitable that the Individual Defendants will disclose CDK's trade secrets to assist Tekion in unfairly competing against CDK and diverting sales from CDK.

102. Tekion misappropriated CDK's trade secrets by (i) acquiring CDK's trade secrets from the Individual Defendants with knowledge that the trade secrets were acquired by improper means, and (ii) using the trade secrets to assist Tekion in building up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK. Tekion did so with the knowledge that the trade secrets were acquired by the Individual Defendants under circumstances giving rise to a duty to maintain their secrecy and that the Individual Defendants used improper means to acquire them.

103. As a result of Defendants' misappropriation of CDK's trade secrets, CDK has suffered and continues to suffer irreparable harm, as well as monetary damages in excess of $75,000, the exact amount to be proven at trial.

104. Defendants have also been unjustly enriched in an amount in excess of $75,000, the exact amount to be proven at trial.

105. Defendants' conduct was willful, knowing, intentional, and malicious, entitling CDK to recovery of punitive damages under 18 U.S.C. § 1836(b)(3)(C).

106. Defendants willfully and maliciously misappropriated CDK's confidential, proprietary, and trade secret information, entitling CDK to an award of reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## COUNT TWO
### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1, *et seq.*
### (As to Tekion, Backs, Auel, Dansby and Abbott)

107.    CDK incorporates the preceding paragraphs as if fully set forth herein.

108.    CDK's pricing, costs, designs, services, sales plans, business model, strategic growth plans, training methods, employee ratings, individual market data, and vendor and customer information constitute "trade secrets" under 765 ILCS 1065/1, *et seq.*

109.    CDK's trade secret information is used in, or intended for use in, interstate or foreign commerce.

110.    CDK's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the information.

111.    CDK has taken reasonable steps to protect its trade secrets from disclosure, including the trade secrets information possessed and/or stolen by Backs, Auel, Dansby, and Abbott and used by Tekion to unfairly compete with CDK.

112.    CDK's reasonable steps to protect its trade secrets from disclosure include, among other things, requiring Backs, Auel, Dansby, and Abbott to sign their Agreements with CDK containing non-competition, non-solicitation, non-disclosure, and confidentiality provisions. Moreover, CDK restricts access to and password protects its trade secret information, including but not limited to, training methods, designs, customer information, and market data.

113.    As employees of CDK, Backs, Auel, Dansby, and Abbott all had access to and knowledge of CDK's trade secrets.

114.    Both during and after their employment with CDK, Backs, Auel, Dansby, and Abbott all had a duty to maintain the secrecy of CDK's trade secrets and to not disclose them to third parties.

115.    Both during and after their employment with CDK, Backs, Auel, Dansby, and Abbott misappropriated CDK's trade secrets by (i) using improper means to acquire CDK's trade secrets by stealing the information without CDK's knowledge or consent in breach of their Agreements and duties owed to CDK, (ii) by disclosing the trade secrets to a third party – CDK's competitor, Tekion – without CDK's knowledge or consent, and (iii) using the trade secrets to assist Tekion build up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK. Backs, Auel, Dansby, and Abbott did so with knowledge that they acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy and used improper means to acquire the trade secrets.

116.    Alternatively, by virtue of their new positions with Tekion it is inevitable that Backs, Auel, Dansby, and Abbott will disclose CDK's trade secrets to assist Tekion in unfairly competing against CDK and diverting sales from CDK.

117.    Tekion misappropriated CDK's trade secrets by (i) acquiring CDK's trade secrets from Backs, Auel, Dansby, and Abbott with knowledge that the trade secrets were acquired by improper means, and (ii) using the trade secrets to assist Tekion in building up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK. Tekion did so with the knowledge that the trade secrets were acquired by Backs, Auel, Dansby, and Abbott under circumstances giving rise to a duty to maintain their secrecy and that Backs, Auel, Dansby, and Abbott used improper means to acquire them.

118.     As a result of Defendants' misappropriation of CDK's trade secrets, CDK has suffered and continues to suffer irreparable harm, as well as monetary damages in excess of $75,000, the exact amount to be proven at trial.

119.     Tekion, Backs, Auel, Dansby, and Abbott have also been unjustly enriched in an amount in excess of $75,000, the exact amount to be proven at trial.

120.     Defendants' conduct was willful, knowing, intentional, and malicious, entitling CDK to recovery of punitive damages under 765 ILCS 1065/4(b).

121.     Defendants willfully and maliciously misappropriated CDK's confidential, proprietary, and trade secret information, entitling CDK to an award of reasonable attorneys' fees under 765 ILCS 1065/5.

## COUNT THREE
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF OHIO'S UNIFORM TRADE SECRETS ACT – R.C. § 1333.61, *et seq.*
### (As to Tekion and Sparks)

122.     CDK incorporates the preceding paragraphs as if fully set forth herein.

123.     CDK possesses certain confidential, proprietary, and trade secret information, including CDK's pricing, costs, designs, services, sales plans, business model, strategic growth plans, training methods, employee ratings, individual market data, and vendor and customer information.  Such information constitutes a "trade secret" under R.C. § 1333.61, *et seq.*

124.     CDK's trade secret information is used in, or intended for use in, interstate or foreign commerce.

125.     CDK's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the information.

126. CDK has taken reasonable steps to protect its trade secrets from disclosure, including the trade secrets information possessed and/or stolen by Sparks and used by Tekion to unfairly compete with CDK.

127. CDK's reasonable steps to protect its trade secrets from disclosure include, among other things, requiring Sparks to sign his Agreement with CDK containing non-competition, non-solicitation, non-disclosure, and confidentiality provisions. Moreover, CDK restricts access to and password protects its trade secret information, including but not limited to, training methods, designs, customer information, and market data.

128. As an employee of CDK, Sparks had access to and knowledge of CDK's trade secrets.

129. Both during and after his employment with CDK, Sparks had a duty to maintain the secrecy of CDK's trade secrets and to not disclose them to third parties.

130. Both during and after his employment with CDK, Sparks misappropriated CDK's trade secrets by (i) using improper means to acquire CDK's trade secrets by stealing the information without CDK's knowledge or consent in breach of his Agreements and duties owed to CDK, (ii) by disclosing the trade secrets to a third party – CDK's competitor, Tekion – without CDK's knowledge or consent, and (iii) using the trade secrets to assist Tekion build up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK. The Individual Defendants did so with knowledge that they acquired the trade secrets under circumstances giving rise to a duty to maintain their secrecy and used improper means to acquire the trade secrets.

131.    Alternatively, by virtue of his new position with Tekion it is inevitable that Sparks will disclose CDK's trade secrets to assist Tekion in unfairly competing against CDK and diverting sales from CDK.

132.    Tekion misappropriated CDK's trade secrets by (i) acquiring CDK's trade secrets from Sparks with knowledge that the trade secrets were acquired by improper means, and (ii) using the trade secrets to assist Tekion in building up its software business, compete against CDK, hire employees away from CDK, and divert sales from CDK.  Tekion did so with the knowledge that the trade secrets were acquired by Sparks under circumstances giving rise to a duty to maintain their secrecy and that Sparks used improper means to acquire them.

133.    As a result of Tekion and Sparks' misappropriation of CDK's trade secrets, CDK has suffered and continues to suffer irreparable harm, as well as monetary damages in excess of $75,000, the exact amount to be proven at trial.

134.    Tekion and Sparks have also been unjustly enriched in an amount in excess of $75,000, the exact amount to be proven at trial.

135.    Tekion and Sparks' conduct was willful, knowing, intentional, and malicious. Accordingly, pursuant to R.C. § 1333.63(B), CDK is entitled to recovery of punitive or exemplary damages in an amount not to exceed three times any award made under R.C. § 1333.63(A).

136.    Tekion and Sparks willfully and maliciously misappropriated CDK's confidential, proprietary, and trade secret information, entitling CDK to an award of reasonable attorneys' fees under R.C. § 1333.64.

## COUNT FOUR
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### (As to Tekion)

137.    CDK incorporates the preceding paragraphs as if fully set forth herein.

138.    CDK had contractual relationships with each of the Individual Defendants in the form of the Agreements.

139.    The Agreements contained, among other things, non-competition, non-solicitation, and non-disclosure provisions.

140.    Tekion had knowledge of CDK's contractual relationships with the Individual Defendants.

141.    Tekion, without justification, intentionally and improperly interfered with CDK's existing contracts with the Individual Defendants by, among other things, (1) recruiting the Individual Defendants to terminate their employment with CDK and work for Tekion in violation of the Agreements, and (2) knowingly receiving confidential, proprietary, and trade secret information from the Individual Defendants and using that information to compete directly with CDK and to divert sales from CDK, causing CDK to suffer lost profits, and (3) receiving and retaining the benefits of the Individual Defendants' breaches of their obligations to CDK.

142.    Tekion made these solicitations without justification and with malicious intent to cause harm to CDK.

143.    As a direct and proximate result of Tekion's tortious interference with CDK's contractual relationships with the Individual Defendants, CDK has suffered and continues to suffer irreparable harm in the marketplace as well as monetary damages in excess of $75,000.

## COUNT FIVE
## UNJUST ENRICHMENT
### (As to All Defendants)

144.    CDK incorporates the preceding paragraphs as if fully set forth herein.

145.    Defendants have received and used CDK's confidential, proprietary, and trade secret information and used that unlawfully appropriated information to unlawfully target and

solicit several CDK employees to terminate their employment and work for Tekion in competition with CDK.

146.     Defendants have benefitted, and continue to benefit, from their receipt and use of CDK's confidential, proprietary, and trade secret information because several CDK employees have terminated their employment with CDK as a direct result of Defendants' and others' solicitations and are now employed by Tekion as Tekion builds up its business to compete directly with CDK.

147.     Defendants have received and used CDK's confidential, proprietary, and trade secret information and used that unlawfully appropriated information to unlawfully target and solicit several CDK customers to divert business away from CDK to Tekion as Tekion builds up its business to compete directly with CDK.

148.     Defendants have benefitted, and continue to benefit, from their receipt and use of CDK's confidential, proprietary, and trade secret information because several CDK customers have diverted business away from CDK to Tekion as Tekion builds up its business to compete directly with CDK.

149.     Defendants are aware of the benefits they have received.

150.     Under the circumstances, it would be unjust to allow Defendants to retain the benefits they received without payment to CDK.

151.     Defendants have been unjustly enriched, and continue to be unjustly enriched in an amount in excess of $75,000, the exact amount to be proven at trial.

**COUNT SIX**
**BREACH OF CONTRACT**
**(As to Backs)**

152.     CDK incorporates the preceding paragraphs as if fully set forth herein.

153.    The Backs Agreement is a valid and binding contract between CDK and Backs.

154.    The Backs Agreement's non-compete provision prohibits Backs from working for a "Competing Business" anywhere in the "Territory" where Backs provided services for CDK.

155.    Tekion is a "Competing Business" under the terms of the Backs Agreement because it markets and sells automotive software and business applications within the automotive retail industry.

156.    Backs is employed by Tekion within the prohibited "Territory" under the terms of the Backs Agreement because Backs is providing services for Tekion less than 15 miles from where he provided services for CDK.

157.    Additionally, the Backs Agreement's confidentiality provision prohibits Backs from disclosing CDK's Confidential Information.

158.    On August 27, 2019, Backs ratified both of the foregoing obligations in the Backs Agreement, for which he was paid valuable consideration.

159.    Backs breached the Backs Agreement by accepting employment with Tekion after his separation from CDK.

160.    Backs breached the Backs Agreement by disclosing CDK's Confidential Information through his employment with Tekion.

161.    Tekion had knowledge of Backs' non-competition and confidentiality obligations.

162.    Backs' actions described herein are malicious, intentional, direct, and material breaches of the Backs Agreement.

163.    CDK performed its obligations under the Backs Agreement at all times prior to Backs' breaches as described herein.

164.     As a direct and proximate result of Backs' breaches, CDK has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in an amount in excess of $75,000, to be proven at trial.

## COUNT SEVEN
## BREACH OF CONTRACT
### (As to Auel)

165.     CDK incorporates the preceding paragraphs as if fully set forth herein.

166.     The Auel Agreement is a valid and binding contract between CDK and Auel.

167.     The Auel Agreement's non-compete provision prohibits Auel from working for a "Competing Business" anywhere in the "Territory" where Auel provided services for CDK.

168.     Tekion is a "Competing Business" under the terms of the Auel Agreement because it markets and sells automotive software and business applications within the automotive retail industry.

169.     Auel is employed by Tekion within the prohibited "Territory" under the terms of the Auel Agreement because Auel is providing services for Tekion less than 15 miles from where she provided services for CDK.

170.     Additionally, the Auel Agreement's confidentiality provision prohibits Auel from disclosing CDK's Confidential Information.

171.     On February 3, 2020, Auel ratified both of the foregoing obligations in the Auel Agreement, for which she was paid valuable consideration.

172.     Auel breached the Auel Agreement by accepting employment with Tekion after her separation from CDK.

173.     Auel breached the Auel Agreement by disclosing CDK's Confidential Information through her employment with Tekion.

174. Tekion had knowledge of Auel's non-competition and confidentiality obligations.

175. Auel's actions described herein are malicious, intentional, direct, and material breaches of the Auel Agreement.

176. CDK performed its obligations under the Auel Agreement at all times prior to Auel's breaches as described herein.

177. As a direct and proximate result of Auel's breaches, CDK has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in an amount in excess of $75,000, to be proven at trial.

**COUNT EIGHT**
**BREACH OF CONTRACT**
**(As to Sparks)**

178. The Sparks Agreement is a valid and binding contract between CDK and Sparks.

179. The Sparks Agreement's non-compete provision prohibits Sparks from working for a "Competing Business" anywhere in the "Territory" where Dansby provided services for CDK.

180. Tekion is a "Competing Business" under the terms of the Sparks Agreement because it markets and sells automotive software and business applications within the automotive retail industry.

181. Sparks is employed by Tekion within the prohibited "Territory" under the terms of the Sparks Agreement because Sparks is providing services for Tekion less than 15 miles from where he provided services for CDK.

182. Additionally, the Sparks Agreement's confidentiality provision prohibits Sparks from disclosing CDK's Confidential Information.

183. On May 19, 2016, Sparks ratified both of the foregoing obligations in the Sparks Agreement, for which he was paid valuable consideration.

184. Sparks breached the Sparks Agreement by accepting employment with Tekion after his separation from CDK.

185. Sparks breached the Sparks Agreement by disclosing CDK's Confidential Information through his employment with Tekion.

186. Tekion had knowledge of Sparks' non-competition and confidentiality obligations.

187. Sparks' actions described herein are malicious, intentional, direct, and material breaches of the Sparks Agreement.

188. CDK performed its obligations under the Sparks Agreement at all times prior to Sparks' breaches as described herein.

189. As a direct and proximate result of Sparks' breaches, CDK has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in an amount in excess of $75,000, to be proven at trial.

## COUNT NINE
## BREACH OF CONTRACT
### (As to Dansby)

190. CDK incorporates the preceding paragraphs as if fully set forth herein.

191. The Dansby Agreement is a valid and binding contract between CDK and Dansby.

192. The Dansby Agreement's non-compete provision prohibits Dansby from working for a "Competing Business" anywhere in the "Territory" where Dansby provided services for CDK.

193. Tekion is a "Competing Business" under the terms of the Dansby Agreement because it markets and sells automotive software and business applications within the automotive retail industry.

194.    Dansby is employed by Tekion within the prohibited "Territory" under the terms of the Dansby Agreement because Dansby is providing services for Tekion less than 15 miles from where he provided services for CDK.

195.    Additionally, the Dansby Agreement's confidentiality provision prohibits Dansby from disclosing CDK's Confidential Information.

196.    On May 5, 2011, Dansby ratified both of the foregoing obligations in the Dansby Agreement, for which he was paid valuable consideration.

197.    Dansby breached the Dansby Agreement by accepting employment with Tekion after his separation from CDK.

198.    Dansby breached the Dansby Agreement by soliciting CDK's employees, including but not limited to Jared Kretschmar.

199.    Dansby breached the Dansby Agreement by disclosing CDK's Confidential Information through his employment with Tekion.

200.    Tekion had knowledge of Dansby's non-competition, non-solicitation, and confidentiality obligations.

201.    Dansby's actions described herein are malicious, intentional, direct, and material breaches of the Dansby Agreement.

202.    CDK performed its obligations under the Dansby Agreement at all times prior to Dansby's breaches as described herein.

203.    As a direct and proximate result of Dansby's breaches, CDK has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in an amount in excess of $75,000, to be proven at trial.

**COUNT TEN**
**BREACH OF CONTRACT**
**(As to Abbott)**

204.     CDK incorporates the preceding paragraphs as if fully set forth herein.

205.     The Abbott Agreement is a valid and binding contract between CDK and Abbott.

206.     The Abbott Agreement's non-compete provision prohibits Abbott from working for a "Competing Business" anywhere in the "Territory" where Abbott provided services for CDK.

207.     Tekion is a "Competing Business" under the terms of the Abbott Agreement because it markets and sells automotive software and business applications within the automotive retail industry.

208.     Abbott is employed by Tekion within the prohibited "Territory" under the terms of the Abbott Agreement because Abbott is providing services for Tekion less than 15 miles from where he provided services for CDK.

209.     Additionally, the Abbott Agreement's confidentiality provision prohibits Abbott from disclosing CDK's Confidential Information.

210.     On November 12, 2015, Abbott ratified both of the foregoing obligations in the Abbott Agreement, for which he was paid valuable consideration.

211.     Abbott breached the Abbott Agreement by accepting employment with Tekion after his separation from CDK.

212.     Abbott breached the Abbott Agreement by disclosing CDK's Confidential Information through his employment with Tekion.

213.     Tekion had knowledge of Abbott's non-competition and confidentiality obligations.

214.    Abbott's actions described herein are malicious, intentional, direct, and material breaches of the Abbott Agreement.

215.    CDK performed its obligations under the Abbott Agreement at all times prior to Abbott's breaches as described herein.

216.    As a direct and proximate result of Abbott's breaches, CDK has suffered, is suffering, and continues to suffer irreparable harm, as well as monetary damages in an amount in excess of $75,000, to be proven at trial.

WHEREFORE, CDK prays that the Court enter judgment in its favor providing the following relief:

A.    Imposing injunctions enjoining Defendants from misappropriating CDK's confidential, proprietary, and trade secret information;

B.    Imposing injunctions requiring Defendants to promptly return to CDK any and all property of CDK in their custody, possession, or control;

C.    Imposing injunctions enjoining the Individual Defendants from breaching the terms of their respective Agreements with CDK from competing against CDK for the period provided for in those Agreements plus an additional period of time equal to each Individual Defendant's period of breach;

D.    Imposing injunctions enjoining Tekion from employing the Individual Defendants in breach of the non-compete covenants contained in their respective Agreements for the period provided for in those Agreements plus an additional period of time equal to each Individual Defendant's period of breach;

E.    Imposing injunctions enjoining Tekion from tortuously interfering with CDK's contractual relationships with its employees;

F.     Awarding compensatory damages against all Defendants in an amount in excess of $75,000;

G.     Awarding punitive damages against all Defendants;

H.     Awarding any and all statutory remedies against all Defendants;

I.     Awarding an order of discouragement against each of the Individual Defendants;

J.     Awarding CDK attorneys' fees and costs incurred in this action against all Defendants;

K.     Awarding pre-judgment and post-judgment interest against all Defendants;

L.     Ordering that Defendants be held jointly and severally liable for all monetary damages awarded herein; and

M.     Awarding CDK such other and further legal or equitable relief as the Court deems just and proper.


Respectfully submitted,

*/s/ Samuel N. Lillard*
Samuel N. Lillard (0040571)
Jantzen D. Mace (0099005)
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Galleria at PNC Plaza
20 S Third Street, Suite 210
Columbus, OH 43215
Phone: 614.494.0420
Fax:     614.633.1455
samuel.lillard@ogletree.com
jantzen.mace@ogletree.com

*Attorneys for CDK Global, LLC*

56680716.v1-OGLETREE

## <u>JURY DEMAND</u>

CDK hereby demands a trial by jury of all issues triable of right by jury.


<u>/s/ Samuel N. Lillard</u>
Samuel N. Lillard (0040571)