IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

**CDK GLOBAL, LLC,**　　　　　　　　　　Case No.: 23-cv-00357

　　**Plaintiff,**　　　　　　　　　　　　　Hon. Jeffery P. Hopkins

vs

**TEKION CORP, et al.,**

　　**Defendants.**

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**I.　　INTRODUCTION**

Plaintiff CDK Global, LLC ("CDK") brings a motion for emergency injunctive relief ("Motion") seeking to enjoin former employees (Andrew Backs, Demi Auel, Tyler Sparks, Richard Dansby, and Christopher Abbott, the "Individual Defendants") from continuing employment relationships that the Individual Defendants established with Defendant Tekion Corp ("Tekion") between 4 and 10 months ago.

First, CDK's Motion should be denied because CDK offers no affidavits, declarations, or other evidence in support. Second, CDK's evidence-free argument fails to overcome the basic principle (under Ohio and Illinois law) that restrictive covenants must be narrowly tailored and protect a legitimate business interest of the former employer to be enforceable. Here, Defendants' evidence (declarations of the Individual Defendants and related documentation) affirmatively establishes that CDK lacks any legitimate business interest in restricting the employment of the Individual Defendants who, while employed at CDK, were comparatively insignificant IT helpdesk workers without any sales responsibility or knowledge of protectable information. Third, CDK offers no evidence satisfying its burden of establishing likelihood of success on the merits

of its breach of contract claims, irreparable harm (or even a threat of irreparable harm), that it will be disproportionately harmed (assuming CDK would be harmed at all) in the absence of injunctive relief. Accordingly, CDK's Motion should be denied.

## II.   FACTS

### A.   The Individual Defendants and Their Former Employment at CDK

CDK is an "automotive technology compan[y] that offer[s] 'dealer management system' ('DMS') software—complex enterprise computer systems employed by car dealerships to collect, manage, and deploy data they generate." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-864, 2023 WL 4305901, at *2 (N.D. Ill. June 29, 2023).[1]

CDK identifies the Individual Defendants as former employees but neglects to inform the Court of their respective duties while employed at CDK. As established in the Declarations supporting this memorandum: (a) Backs and Dansby provided technical support at CDK's helpdesk to troubleshoot DMS software questions and/or issues; (b) Auel provided designated technical support related to the functionality of a specific automotive manufacturer's dealer website; and (c) Sparks and Abbott worked as supervisors of others working in these same technical support roles. **Ex. 1 ¶ 5; Ex. 2 ¶ 4; Ex. 3 ¶ 7; Ex. 4 ¶ 5; Ex. 5 ¶ 4**. Importantly, the Individual Defendants did not work for CDK in sales, marketing, or design, and were not involved in company strategy. **Ex. 1 ¶ 10; Ex. 2 ¶ 10; Ex. 3 ¶ 12; Ex. 4 ¶ 10; Ex. 5 ¶ 9**.

CDK alleges that the Individual Defendants signed varied documents: Backs and Auel: a

---

[1] CDK has been involved in numerous lawsuits regarding its DMS software and, *inter alia*, CDK's alleged "anticompetitive conduct" and/or antitrust violations. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 2023 WL 4305901, at *2 n.2 ("The court has detailed the basic facts of this MDL in multiple opinions and assumes knowledge of those opinions here. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.* ("Authenticom MTD Op."), 313 F. Supp. 3d 931 (N.D. Ill. 2018); *In re Dealer Mgmt. Sys. Antitrust Litig.* ("AutoLoop MTD Op."), 362 F. Supp. 3d 477 (N.D. Ill. 2019); *In re Dealer Mgmt. Sys. Antitrust Litig.* ("Dealers MTD Op."), 362 F. Supp. 3d 510 (N.D. Ill. 2019); *In re Dealer Mgmt. Sys. Antitrust Litig.* ("Daubert Op."), 581 F. Supp. 3d 1029 (N.D. Ill. 2022).").

"Confidentiality and Restrictive Covenant Agreement;" Sparks: a "Restrictive Covenant Agreement;" Dansby: a "Non-Disclosure Agreement" with a third-party; and Abbott: a "Non-Disclosure Agreement." Documents Backs, Auel, and Sparks are alleged to have signed are attached to the Complaint. [ECF Nos. 1-2, 1-3, 1-4, 4]. But CDK merely attached "acknowledge[ments]" and no actual agreements for Dansby and Abbott. [ECF Nos. 1-5, 1-6.]

### B. The Individual Defendants Separately Resigned over Six Months' Time

Abbott resigned in November 2022. [*See* ECF No. 1 ¶ 35]. Prior to resigning, Abbott did not possess a document containing a restrictive covenant. **Ex. 1** ¶ 13. His search of CDK's human resources portal also failed to reveal any such document. *Id.* ¶ 15. Therefore, he inquired into whether any restrictive covenant purportedly restricted his future employment. He directly asked Anne Hoffmaster (a CDK Senior Vice President who oversaw Abbott's role) and Aundrea Waller (a CDK HR business partner) whether he was bound by any restrictive covenants. *Id.* ¶ 16. They informed Abbott that: (1) he was not bound by any restrictive covenant; and (2) even if one existed, it was "not something to be concerned about" because Abbott's job position and duties at CDK (as a manager of IT helpdesk employees) were not the type that were otherwise subject to a restrictive covenant. *Id.* ¶¶ 17-18. Abbott relied on these representations, resigned from CDK, and accepted employment with Tekion. *Id.* ¶ 19. Prior to leaving CDK, Abbott let Hoffmaster, Mike Wunderlich (Abbott's immediate supervisor), Debbie Hetzel (senior director, Customer Care), Gerardo Dinglasan (a Client Services Manager), and other CDK managers know that Abbott had accepted a position with Tekion. *Id.* ¶ 20. They said nothing about a restrictive covenant and wished Abbott good fortune. *Id.* ¶¶ 21-22.

The following month, December 2022, Sparks resigned. [*See* ECF No. 1 ¶ 49]. Backs resigned in January 2023. [*See* ECF No. 1 ¶ 62] Auel resigned in April 2023. [*See* ECF No. 1 ¶ 77]

3

And Dansby resigned in May 2023. [*See* ECF No. 1 ¶ 90]

CDK informed the departing employees that its security team monitors the printing, transfer, and/or electronic transmission of CDK information to non-CDK email addresses. **Ex. 2** ¶ 18 (citing Ex. A); **Ex. 3** ¶ 21 (citing Ex. A); **Ex. 4** ¶ 19 (citing Ex. A). But, there was no discussion of any restrictive covenants. *See generally id.* And, like Abbott had previously, the Individual Defendants informed their managers and CDK's HR team that they had accepted a role with Tekion:

- Sparks advised Hoffmaster and his direct manager (Dinglasan) that he was planning to resign and join Tekion and met with HR prior to leaving CDK. **Ex. 2** ¶ 12.

- Dansby advised his direct manager (Jeff Harding) that he was planning to resign and join Tekion, and the nature of his future job duties at Tekion, and met with HR prior to leaving CDK. **Ex. 3** ¶ 14. After Dansby gave notice of his resignation, Harding contacted Dansby and asked him to stay with CDK. *Id.* ¶ 16. Other than this, the only feedback Dansby received prior to departure was "good luck," including from Hoffmaster. *Id.*

- Backs advised Hoffmaster and his manager (Harding) that he was planning to resign and met with HR prior to leaving. **Ex. 4** ¶ 12. The only feedback Backs received prior to departure was "well wishes," including from Hoffmaster. *Id.* ¶ 14.

- Auel advised her manager (Amari Benjelloun), that she was planning to resign and join Tekion. **Exhibit 5** ¶ 11. Dinglasan also independently confirmed that Auel was transitioning to Tekion, and remarked that he was familiar that Abbott and Sparks had also done so. *Id.* ¶ 12. The only feedback Auel received prior to departure was "well wishes," including from Dinglasan. *Id.* ¶ 13.

No one at CDK mentioned any concern regarding purported restrictive covenants. **Ex. 2** ¶¶ 14-15; **Ex. 3** ¶¶ 16-18; **Ex. 4** ¶¶ 15-16; **Ex. 5** ¶¶ 14-15. Prior to their respective resignations, the Individual Defendants were all aware that numerous other CDK employees had previously resigned to join Tekion without incident. **Ex. 1** ¶ 23; **Ex. 2** ¶ 17; **Ex. 3** ¶ 20; **Ex. 4** ¶ 18; **Ex. 5** ¶ 17. CDK failed to take any steps to enforce any purported agreements. *See id.*

Notably, CDK does not allege that any Individual Defendant removed CDK documents or information from their electronic devices, and all Individual Defendants returned CDK-issued

4

computer equipment to CDK. **Ex. 1** ¶ 24; **Ex. 2** ¶ 19; **Ex. 3** ¶ 22; **Ex. 4** ¶ 20; **Ex. 5** ¶ 18.

    **C.    Pre-Litigation Communications.**

On or about May 9, 2023, counsel for CDK sent letters to the Individual Defendants alleging breach of certain restrictive covenants. The Individual Defendants responded and informed CDK: (i) that they were unaware of any (purported) restrictive covenant; (ii) CDK managers advised at least one Individual Defendant that no such restrictive covenants existed; (iii) considering their roles and/or job duties at CDK, employment with Tekion did not interfere with or otherwise threaten any of CDK purported legitimate competitive business interests; (iv) any purported restrictive covenants was unenforceable as applied; and (v) CDK's hypothetical concerns regarding possible disclosure of CDK's (unspecified) confidential information and/or trade secrets were baseless. In a separate letter to Tekion, CDK's counsel alleged that Tekion had engaged in tortious interference. Tekion responded on May 16, 2023, setting forth similar (and other) defenses. Tekion nevertheless invited CDK to provide more specificity regarding their concerns for Tekion's further investigation.

CDK never replied to either letter. On June 12, 2023, CDK filed the instant lawsuit. Like CDK's pre-suit letters, the Complaint lacks sufficient specificity to support its causes of action, and fails to attach any restrictive covenants executed by Dansby or Abbott. Rather, in footnotes, CDK alleges that "[u]pon information and belief, the 'Non-Disclosure' Agreement[s] signed by Dansby [and Abbott] contained substantially the same non-competition, non-solicitation, and non-disclosure provisions as the Backs, Auel, and Sparks Agreements." [ECF No. 1 ¶¶ 67 n.1, 82 n.1.]

**III.    LAW AND ANALYSIS**

"Plaintiff bears the <u>heavy burden</u> of demonstrating its entitlement to injunctive relief. An 'injunction is an extraordinary remedy which should be granted only if the movant carries his or

her burden of proving that the circumstances <u>clearly</u> demand it.'" *Concentrix CVG Customer Mgmt. Grp. Inc. v. Daoust*, No. 21-131, 2021 WL 1734284, at *8 (S.D. Ohio May 3, 2021) (quoting *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)) (emphasis in original). Courts weigh four factors when determining whether to grant injunctive relief:

> (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.

*Id.* (citing *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526–27 (6th Cir. 2017). "These four considerations are factors that must be balanced, not prerequisites that must be met." *Id.* (citing *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)).

### A. CDK Has Not Established a Likelihood of Success of Merits on its Breach of Contract Claims

#### 1. CDK Has Not Introduced Admissible Evidence to Support Its Breach of Contract Claims

CDK's Motion rests solely on the argument of counsel and unverified allegations in CDK's Complaint. However, "allegations in a motion do not constitute evidence supporting the need for injunctive relief." *Lovett v. Barney*, No. 15-024, 2016 WL 4472764, at *2 (S.D. Ohio Aug. 25, 2016). *See also Thomas v. Erdos*, No. 16-793, 2018 WL 1175299, at *1 (S.D. Ohio Mar. 6, 2018) ("allegations in [a] motion do not constitute evidence supporting injunctive relief."). Where a plaintiff has not submitted any evidence in support of its likelihood of success on the claims that form the basis for its motion for injunctive relief, such motion should be denied. *Lovett*, 2016 WL 4472764, at *2; *Thomas*, 2018 WL 1175299, at *1.[2]

---

[2] *See also Cincinnati Indus. Mach., Inc. v. VMI Holland BV*, No. 09-604, 2010 WL 597820, at *11 (S.D. Ohio Feb. 17, 2010) (where plaintiff failed to "put forth evidence that [defendant] has actually disclosed or will disclose any trade secrets to a third party," plaintiff's fallback "unsupported assertion that [defendant's continued operation] will inevitably result in disclosure of its trade secrets is insufficient to show a likelihood of success on its claim of misappropriation").

6

CDK has not offered evidence in support of *any* of its allegations. CDK has not introduced evidence of: (a) the Individual Defendants' job duties at CDK or presently at Tekion; (b) a "legitimate business interest" supporting enforcement of alleged restrictive covenants; (c) CDK's alleged trade secret (or confidential) information; (d) whether the Individual Defendants actually acquired, used, or disclosed the unidentified alleged trade secrets; or (e) facts to support "inevitable disclosure" of any such information. Conversely, the Declarations of the Individual Defendants refute CDK's generic and unsupported allegations with particularity. *See* **Ex. 1**; **Ex. 2**; **Ex. 3**; **Ex. 4**; **Ex. 5**. Considering this disparity in the parties' evidence, CDK has not "clearly" met its "heavy burden of demonstrating its entitlement to injunctive relief." *Daoust*, 2021 WL 1734284, at *8 (quoting *Overstreet*, 305 F.3d at 573).

    **2.**    **The Restrictive Covenants Are Not Enforceable**

        **a.**    **CDK Fails to Establish a Contract with Dansby or Abbott**

CDK's Complaint and Motion do not attach any restrictive covenant between it and either Dansby or Abbott. Instead, CDK offers its purported "belief" regarding the contents of those absent documents. [ECF No. 1 ¶¶ 67 n.1, 82 n.1.] Based on this speculative assertion, CDK proceeds as if the precise language and terms of those absent documents are established.

Ohio and Illinois[3] law require a plaintiff to plead that a binding contract exists. *Transp. Ins. Co. v. Busy Beaver Bldg. Ctrs., Inc.*, 969 F. Supp. 2d 875, 884 (S.D. Ohio 2013) (citing *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 976 (N.D. Ill. 2002)) (citing Ohio and Illinois law). "[T]here is no express authorization in the federal rules for pleading on information and belief." *Cassidy v. Teaching Co., LLC*, No. 13-884, 2014 WL

---

[3] Because CDK's "upon information and belief" allegations and certain circumstances regarding the purported execution of the restrictive agreements (see *infra*) make it implausible that the purported restrictive agreements involving Dansby and Abbott are "substantially the same" to those of Backs/Auel/Sparks (as alleged in CDK's Complaint), this Section addresses both Ohio and Illinois law (which, as set forth herein, is essentially the same).

7

1599518, at *3 (S.D. Ohio Apr. 21, 2014) (citing Charles A. Wright and Arthur R. Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (3d ed. 2013)). However, under *Iqbal* and *Twombly*, pleading certain matters "upon information and belief" is permissible "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Id.* (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005).[4]

Neither exception applies in this action. Facts, if any, supporting the existence of restrictive covenants between CDK and Dansby or Abbott (and the terms thereof) are exclusively within CDK's possession, not the possession of Dansby or Abbott. Also, CDK specifically informed Abbott that no such agreement existed for him. **Ex. 1** ¶¶ 16-18. Further, the blank acknowledgement offered as CDK's proof of restrictive covenants with Dansby references a "Non-Disclosure Agreement" between Dansby and a third-party, not CDK. Considering the foregoing, CDK's plea that the Court infer the existence of restrictive covenants with terms certain is distinctly implausible.

      b.      **Even if Dansby Were Subject to a Restrictive Agreement as Alleged, CDK Cannot Enforce It**

As stated, Dansby's alleged "acknowledgement" states that the "agree[ment] and "acknowledgement" of the "ADP Non-Disclosure [A]greement" "must be completed prior to [his] actual start with ADP." [ECF No. 1-5.] This document is dated May 5, 2011, around when Dansby was employed by Automatic Data Processing, Inc. ("ADP"). Accordingly, CDK is inherently

---

[4] *See also Kline v. Mortg. Elec. Registration Sys., Inc.*, No. 08-408, 2011 WL 1233642, at *6 (S.D. Ohio Mar. 29, 2011) (citing *Artista Records* and finding that unjust enrichment allegations based "upon information and belief" were permissible because they are "fact[s] peculiarly within the possession of [defendant]"); *Wu v. Passive Wealth Builders, LLC*, No. 21-02205, 2023 WL 121997, at *5 (W.D. Tenn. Jan. 6, 2023) (citing *Cassidy* finding that allegations of fraud "upon information and belief" were permissible where "the facts that would clarify the relationship are within the control of [defendants]"); *Drofa v. Passive Wealth Builders, LLC*, No. 22-02191, 2023 WL 172035, at *5 (W.D. Tenn. Jan. 12, 2023) (same as *Wu*).

seeking to enforce a purported covenant that was purportedly assigned to it. But, under Ohio law, non-compete agreements are not automatically assignable. *Fitness Experience, Inc. v. TFC Fitness Equip., Inc.*, 355 F. Supp. 2d 877, 888 (N.D. Ohio 2004). "When a non-compete agreement is silent about assignability, courts must give controlling effect to the intent of the parties which is primarily ascertained by determining 'whether the covenant employs words which indicate that assignment was contemplated and whether assignability is necessary to protect the goodwill of the business being sold.'" *Id.* at 889 (quoting *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 786 N.E.2d 914, 920 (Ohio Ct. App. 2003)). Because there is no written agreement for the Court to review, CDK has failed to prove that the purported agreement was assignable. The Court must assume that the purported agreement is silent on assignability. Where an agreement lacks language regarding its assignability, "courts must consider the nature of the business and the particular employee's position in order to weigh this factor's effect on evincing the parties' intent regarding assignability." *Id.* at 890. Relevant factors include "the importance of non-compete agreements to the protection of the good will of the business sold[, which] operates on a spectrum." *Id.* In *Fitness Experience*, the Court found that, notwithstanding the "importance" of the defendants' positions (i.e., managerial roles), the subject agreements were not necessary to protect the plaintiff "against employees resigning and taking valued clients with them," and thus, the parties to the agreements did not intend for them to be assignable. *Id.*

In the instant case, Dansby's job duties involved providing technical support for clients who contacted CDK's helpdesk to troubleshoot questions and/or issues the clients were experiencing with CDK's DMS software. A technical support employee is not the type of position where a restrictive covenant is necessary to protect Plaintiff from employees resigning and taking CDK's clients—car manufacturers and licensed dealerships—from leaving CDK to do business

9

with the technical support employee's new employer. Indeed, CDK's Senior Vice President, Anne Hoffmaster, confirmed as much to Abbott. **Ex. 1 ¶¶** 16-18.

### c. The Restrictive Agreements Are Not Tailored to CDK's Alleged Legitimate Business Interests and Thus Are Not Enforceable

#### 1. Applicable Law Regarding "Legitimate Business Interests"

Under Ohio law, non-compete agreements are enforced only to the extent they are reasonable. *Daoust*, 2021 WL 1734284, at *10 (citing *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 275 (Ohio Ct. App. 2000)). "A noncompete agreement will be deemed reasonable when the moving party can demonstrate by clear and convincing evidence that the restrictions imposed '(1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public.'" *MetroHealth Sys. v. Khandelwal*, 183 N.E.3d 590, 595 (Ohio Ct. App. 2022) (quoting *Century Business Servs., Inc. v. Barton*, 967 N.E.2d 782 (Ohio Ct. App.)). "It is the employer's burden to prove that there is a legitimate business interest to be protected." *Id.* at 596 (internal citations omitted). "When determining the validity on a non-compete, 'each case must be decided on its own facts.'" *Daoust*, 2021 WL 1734284, at *10 (quoting *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (1975)). Specifically, "[c]ourts consider the following nine factors in assessing the reasonableness of a non-compete agreement":

> (1) whether the covenant imposes temporal and spatial limitations; (2) whether the employee had contact with customers; (3) whether the employee possesses confidential information or trade secrets; (4) whether the covenant bars only unfair competition; (5) whether the covenant stifles the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportionate to the employee's detriment; (7) whether the covenant destroys the employee's sole means of support; (8) whether the employee's talent was developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment.

*Id.* (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325

N.E.2d at 544)).

Illinois law is similar: "[a] restraint on trade is reasonable only if it: (1) is no greater than is required to protect a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public." *AssuredPartners, Inc. v. Schmitt*, 44 N.E.3d 463, 471 (Ill. App. Ct. 2015). *See also Instant Tech. LLC v. DeFazio*, 793 F.3d 748, 750 (7th Cir. 2015) ("In Illinois a restrictive covenant in an employment agreement is valid only if it serves a legitimate business interest."). Also similar to Ohio law, Illinois courts consider "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case," which include the following non-exhaustive list: "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *AssuredPartners*, 44 N.E.3d at 471. No single factor bears greater value, and Courts must weigh each factor depending upon "the specific facts and circumstances of the individual case." *Id.* However, it is the "employer['s] . . . burden [to] show[] that the full extent of the restriction is necessary to protect its legitimate business needs." *Dent Wizard Int'l Corp. v. Andrzejewski*, No. 20-0574, 2021 WL 1611106, at * 6 ¶ 34 (Ill. App. Ct. Apr. 23, 2021) (quoting *Nw. Podiatry Ctr., Ltd. v. Ochwat*, 990 N.E.2d 347, 359 (Ill. App. Ct. 2013)). *See also* 820 ILCS 90/7 (codifying the foregoing caselaw regarding the "[l]egitimate business interest of the employer").

In *Concentrix CVG Customer Management Group Inc. v. Daoust*, No. 21-131, 2021 WL 1734284 (S.D. Ohio May 3, 2021), this Court denied an employer's motion for preliminary injunction against its former employee where the non-competition agreement was, on the whole, unreasonable. The employer (Concentrix), which provided "customer-service management, call-center operations, and general business-process management services," brought suit against its

11

former employee (Daoust) who had worked at Concentrix for 22 years, including most recently in an executive capacity (as Senior Vice President – Operations). After Daoust joined a purported competitor, Concentrix filed suit for breach of a non-competition agreement and misappropriation of trade secrets. In ruling on a motion for a preliminary injunction and weighing Ohio's nine reasonableness factors, this Court found that, on the whole, "enjoining Daoust's employment with TaskUs and enforcing the agreement would be unreasonable." Specifically, while certain aspects of the non-competition agreement (e.g., the time and spatial limitations) were reasonable, numerous other factors weighed against Contentrix, including that: (a) "[a]lthough Daoust had some customer contact, he was not soliciting customers for Concentrix nor the sole contact for any customer (factor two); (b) Contentrix failed to prove Daoust actually had its "confidential information" and/or "trade secrets" (e.g., "over four months, . . . the record before the Court is silent on any instances of Daoust stealing Concentrix's clients, employees, or otherwise using confidential information") (factor three); (c) the non-competition agreement unlawfully "stifles ordinary competition," as opposed to only unfair competition (factor four); (d) "Daoust would face detriment if the agreement were enforced, forcing him to forego a career advancement opportunity[]" (factor seven).

### 2. CDK Does Not Have a "Legitimate Business Interest" with Respect to Restricting the Individual Defendants

CDK fails to identify a "legitimate business interest." Accordingly, its Motion is facially insufficient. However, even if CDK had adequately offered a "legitimate business interest," CDK has not demonstrated (nor can it) that enforcement of restrictive agreements here is necessary to protect said interests. The facts of *Daoust* are substantially similar to the instant case (and where they differ the Individual Defendants' restrictive agreements are even more unenforceable). In *Daoust*, the subject employee was a Senior Vice President in charge of operating a call center

12

earning nearly $500,000 annually. In this case, the Individual Defendants were low-level call center employees making approximately one-tenth of that the *Daoust* defendant's salary while serving in entry-level traditional IT helpdesk roles (or managing such persons). A CDK customer experiencing trouble with CDK's DMS software would contact CDK's helpdesk (through a generic phone number or email address) and be randomly assigned to a helpdesk worker, and the Individual Defendants constituted a fraction of those employees.[5] **Ex. 1 ¶ 7; Ex. 2 ¶¶ 6-7; Ex. 3 ¶ 9; Ex. 4 ¶ 7; Ex. 5 ¶ 6.** The Individual Defendants do not solicit customers, do not have any sales, pricing, marketing, or design responsibility, and were not involved in CDK company strategy. **Ex. 1 ¶ 10; Ex. 2 ¶ 10; Ex. 3 ¶ 12; Ex. 4 ¶ 10; Ex. 5 ¶ 9.** The Individual Defendants did not have any special knowledge about CDK's proprietary, confidential, or trade secret information. Instead, they were merely familiar with how to use (and troubleshoot) CDK's DMS software. **Ex. 1 ¶¶ 7-8; Ex. 2 ¶¶ 8-9; Ex. 3 ¶¶ 10-11; Ex. 4 ¶¶ 8-9; Ex. 5 ¶ 7-8.** Anyone could acquire that familiarity and skill simply by using the software on a frequent basis. *See id.* None of the Individual Defendants' familiarity with CDK's DMS software is competitively helpful outside of working for CDK or with its DMS software. *See id.* Indeed, the Individual Defendants' roles at Tekion involve the Individual Defendants providing similar helpdesk services to Tekion's customers regarding Tekion's application, which is completely different (akin to, for example, moving from LexisNexis to Westlaw, or WordPerfect to Microsoft Word).[6] The Individual Defendants "cannot be enjoined 'from using knowledge and skill that is general in the trade as a whole.'" *TGR Ents., Inc. v. Kozhev*, 853 N.E.2d 739, 745 ¶ 29 (Ohio Ct. App. 2006). To this end, any general knowledge the Individual

---

[5] It should be noted that Auel worked on a team providing designated technical support related to the functionality of a single automotive manufacturer's dealer website. To this end, that manufacturer had a separate, designated helpdesk line, or which Auel was one of several other employees.

[6] Specifically, Tekion offers an automotive retail transaction software application (including its Automotive Enterprise Cloud program) that links automotive manufacturers, retailers, and consumers from the point of the consumer's purchase of an automobile through delivery.

Defendants have about CDK's DMS system is not usable in their new roles at Tekion. CDK has not introduced any evidence that the Individual Defendants took any CDK paper or electronic records (despite CDK's practice of monitoring that potential).

CDK also cannot claim that the Individual Defendants' general knowledge of CDK's customers is confidential, proprietary, or trade secret. As CDK admits, it primarily provides its DMS software to automotive dealers. [*See* ECF No. 14, PageID.256.] The Illinois Court of Appeals recently found in *Dent Wizard* that customer information related to automotive dealers is "generally insufficient to establish a legitimate business interest" because of its public availability:

> Dent Wizard's clients appear to have primarily been car dealerships. It is not especially difficult to find a list of car dealerships in a given area, as these businesses serve the general public and are readily discoverable by a simple internet search. Additionally, Dent Wizard failed to demonstrate why it would be difficult to locate the correct person at a dealership to speak to regarding performing touch-up services; presumably it would be the managers, who are likely listed on the dealership's website. Customer information which is known by others in the trade or could be easily duplicated is generally insufficient to establish a legitimate business interest. *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 269 (2007).

*Dent Wizard*, 2021 WL 1611106, at * 5 ¶ 28. Moreover, nine months having passed since the first Individual Defendant left to join Tekion, CDK has not offered any evidence that it lost (or that the Individual Defendants have even solicited) a single CDK client.

### 3. The Inevitable Disclosure Doctrine Does Not Apply

This Court should also reject CDK's request to apply the inevitable disclosure doctrine as both inapplicable and devoid of any supporting evidence. *First*, the doctrine only applies to "employee[s] with detailed and comprehensive knowledge of an employer's trade secrets." *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio App. Ct. 2000) (citing *Pepsico, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)). The *PepsiCo* Court analogized the employee's required level of such trade secret knowledge as follows: "In other words, PepsiCo finds itself in

14

the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Pepsico*, 54 F.3d at 1269. In the instant case, the Individual Defendants—IT helpdesk employees and their supervisors—do not have any such "playbook" regarding CDK's operations, let alone **any** alleged proprietary, confidential, or trade secret information. *Second*, courts applying Illinois and Ohio law have rejected CDK's argument that merely because an employee "assume[s] a similar position at a competitor" that the employee will "inevitabl[y] . . . disclose . . . trade secret information." *Accel Sch. LLC v. Thorson*, No. 19-2144, 2019 WL 13194891, at *2 (N.D. Ohio Sept. 19, 2019) (citing *Pepsico*, 54 F.3d at 1269 ("the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information' so as to 'demonstrate irreparable injury'")); *DM Trans, LLC v. Scott*, 38 F.4th 608, 620-21 (7th Cir. 2022) ("Just because the individual defendants remained in the third-party logistics industry does not mean they would inevitably disclose trade secrets."). In the instant case, CDK has provided no allegations (other than its formulaic recitation of the elements for a preliminary injunction and/or its claims) to support the relief requested. To the contrary (and as set forth above), by virtue of their former job duties at CDK, the Individual Defendants do not have any of CDK's trade secret information. *Daoust*, 2021 WL 1734284, at *16 ("It is unnecessary for the Court to consider the inevitable disclosure doctrine, finding that Concentrix has not carried its burden of demonstrating a strong likelihood of success on the existence of trade secrets.").

\*     \*     \*

For the foregoing reasons, not only has CDK not met its burden to demonstrate that the Individual Defendants' restrictive agreements are necessary to protect CDK's "legitimate business interests," but the facts regarding the Individual Defendants' respective employment at CDK and

15

Tekion establishes that CDK is not likely to succeed on the merits of its breach of contract claims. Consequently, this Court should deny CDK's Injunction Motion. *A.F. v. Ass'n of Am. Med. Colleges*, No. 23-1241, 2023 WL 4072128, at *12 (S.D. Ohio June 20, 2023) ("inability to show a likelihood of success on the merits, standing alone, is enough to deny" injunction motion).

> **B. CDK Has Not Introduced Any Evidence of Irreparable (or Any) Harm, and No Such Harm Exists**

"To be granted an injunction, the 'plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury.'" *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969-70 (6th Cir. 2002) (quoting *Clark v. Mt. Carmel Health*, 706 N.E.2d 336, 339 (Ohio Ct. App. 1997)).

Notably, irreparable harm may not be presumed by stipulation in advance. *See Patio Enclosures*, 39 F. App'x at 970 (quoting *Levine v. Beckman*, 548 N.E.2d 267, 270-71 (Ohio Ct. App. 1988) (rejecting stipulation of irreparable harm in an agreement because "[a]ctual injury . . . must be proved" and may not be presumed through stipulation); *Kozhev*, 853 N.E.2d at 746 ¶ 36 (quoting *Patio Enclosures*, 39 F. App'x at 970 )("whether irreparable injury occurred is a mixed question of law and fact to be determined by the court . . . and cannot be resolved by a mere stipulation of fact."); *Bougie v. Barth-Niggemann*, No. 21-0250, 2022 WL 152873, at *8 (Ill. App. Ct. Jan. 18, 2022) (denying preliminary injunction "threatened injury amounted to mere speculation" and plaintiffs otherwise "failed to prove that they would suffer irreparable harm in the absence of a permanent injunction," notwithstanding operating agreement provision that breach would likely cause irreparable harm). To this end, statements in the purported restrictive agreements are insufficient to demonstrate irreparable harm.

CDK next assumes, without evidence, that irreparable harm exists because of "the likely interference with customer relationships" that the Individual Defendants' continued employment

16

through Tekion would cause. [ECF No. 14, PageID.268.] As set forth above, the Individual Defendants did not solicit customers or have any sales, pricing, or marketing responsibility at CDK, and this remains true at Tekion. **Ex. 1** ¶ 10; **Ex. 2** ¶ 10; **Ex. 3** ¶ 12; **Ex. 4** ¶ 10; **Ex. 5** ¶ 9. CDK does not refute this and has not offered any evidence of any such harm.

Furthermore, because CDK is not likely to succeed on its contract claims, there is insufficient evidence (let alone clear and convincing evidence) that Tekion's employment of the Individual Defendants is a breach of the restrictive agreements or that it is "unfair."

In addition, for the reasons set forth above, the inevitable disclosure doctrine is not applicable and, in any event, CDK has failed to introduce any evidence in support of its application.

Finally, CDK's delay in bringing this Motion (nine months from when CDK first learned that the first Individual Defendant, Abbott, had left CDK to go to Tekion, and two months after filing the Complaint) supports that any harm to CDK is *not* irreparable. *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 868 (S.D. Ohio 2008) ("The circumstances of this case indicate that Plaintiff delayed in requesting injunctive relief [by not bringing its injunction motion for six months after learning of the underlying wrongdoing and three weeks after filing the Complaint], which indicates that there is no threat of irreparable harm to Plaintiff.").

**C.** **The Comparative Burdens Do Not Weigh in CDK's Favor**

The third preliminary injunction factor addresses "[t]he irreparable injury [the plaintiff] will suffer if [its] motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Daoust*, 2021 WL 1734284, at *16 (quoting *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982)). "Where harm to others exists from an injunction, the party seeking the injunction must make an even stronger showing on the other factors to justify its issuance." *Extracorporeal All.*,

17

*LLC v. Rosteck*, 285 F. Supp. 2d 1028, 1045 (N.D. Ohio 2003), *aff'd*, 113 F. App'x 98 (6th Cir. 2004) (internal citations omitted).

If this Court grants an injunction, Tekion will effectively be prohibited from continuing to employ persons it trained and in whom it has invested three to nine months of effort. Since the employees have no CDK confidential, proprietary, or trade secret information, Tekion would be unfairly deprived of its right to employ persons it hired and trained in good faith.

With respect to the Individual Defendants, as set forth in their respective Declarations, each will be deprived of their ability to earn a living. *See Kyrkos v. Superior Beverage Grp., Ltd.*, No. 99444, 2013 WL 5676256, at *5 ¶ 26 (Ohio Ct. App. Oct. 17, 2013) (where employee's income at new employer was "sole means of support" and injunction would otherwise prevent employee from "earn[ing] a living," entry of injunction would otherwise be an abuse of discretion); *MEMC Elec. Materials v. Balakrishnan*, No. 12-344, 2012 WL 3962905, at *13 (S.D. Ohio Sept. 11, 2012) (where plaintiff failed to demonstrate likelihood of success on breach of contract and misappropriation claims and where alleged harm to plaintiff was otherwise speculative or unstained, former employee would be disproportionately "harmed if this Court enjoins him from working at [his new employer] because he will be unemployed," which "weighs in favor of denying" the requested injunction); *Jacono v. Invacare Corp.*, 2006 WL 832451, at *8 ¶¶ 44-45 (Ohio Ct. App. March 30, 2006) (upholding denial of injunction because harm to former employee was greater than harm to former employer where "injunction could prevent [employee] from obtaining a higher standard of living and diminish her chances of future employment in her chosen field). Indeed, recognizing that restrictive agreements for certain income thresholds can prohibitively burden employees from earning a living, the Illinois legislature recently passed the Illinois Freedom to Work Act, which would have otherwise rendered unenforceable the purported

18

restrictive agreements in this case. *See* 820 ILCS 90/10 (prohibiting noncompetes for employees earning under $80,000 for all agreements executed after January 1, 2022).

CDK argues that this harm is of the Individual Defendants' own making, but this ignores their open communication with CDK prior to their respective resignations. When considering resignation from CDK, Defendant Abbott investigated the existence of any purported restrictive agreement and was affirmatively told that none existed; and even if it did, it would not be enforceable because of the insignificance of Abbott's (and the other Individual Defendants') job duties at CDK (i.e., that CDK had no legitimate business interests in enforcing the agreement against the Individual Defendants). The other Individual Defendants provided advance notice of their intentions to join Tekion. In response, they were asked to stay and/or wished well. Numerous other CDK employees (with greater responsibility at CDK) had previously joined Tekion without controversy or consequence. Based on these representations and actions, the Individual Defendants also resigned and joined Tekion.

This Court should not reward CDK for its silence on post-employment restrictive agreements, especially considering that the Individual Defendants may have made different career choices otherwise. In sum, entry of an injunction at this point would be unjustifiably detrimental and unreasonable.

### D. CDK Has Not Established Harm to the Public

The fourth factor addresses whether granting an injunction would harm the public interest. While "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest," *Daoust*, 2021 WL 1734284, at *17 (internal citations omitted), "there is also an interest in 'not restricting employment opportunities for employees.'" *Id.* (quoting *Convergys Corp. v. Wellman*, No. 07-509, 2007 WL 4248202, at *7 (S.D. Ohio Nov.

19

30, 2007). *See also Allison v. CRC Ins. Servs., Inc.*, No. 10-3313, 2010 WL 2523208, at *10 (N.D. Ill. June 21, 2010) (citing *Jefco Labs., Inc. v. Carroo*, 483 N.E.2d 999, 1001 (Ill. App. Ct. 1985)) (because restrictive covenants are disfavored by the courts, enforcement of such covenants contrary to freedom of employment runs contrary to the public interest). Consequently, this factor is neutral and does not weigh for or against injunctive relief. *Daoust*, 2021 WL 1734284, at *17.

## IV. CONCLUSION

For the foregoing reasons, this Court should deny CDK's Motion for Preliminary Injunction and award Defendants any other relief this Court deems equitable and just.

Respectfully submitted,

HICKEY HAUCK BISHOFF JEFFERS & SEABOLT, PLLC

*/s/ Patrick F. Hickey*
Patrick F. Hickey (*Admitted Pro Hac Vice*)
Benjamin I. Shipper (*Admitted Pro Hac Vice*)
One Woodward Ave., Suite 2000
Detroit, MI 48226
(313) 964-8600
phickey@hhbjs.com
bshipper@hhbjs.com


BRICKER GRAYDON LLP

*/s/ Michael A. Roberts (with consent)*
Michael A. Roberts (Oh. Bar #: 0047129)
*Trial Attorney*
Alexandra M. Berry (Oh. Bar #: 0098176)
312 Walnut St., Suite 1800
Cincinnati, OH 45202
(513) 629-2799
mroberts@brickergraydon.com
aberry@brickergraydon.com

*Counsel for Defendants*